# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| United States of America, | ) | CR-09-1119-TUC-RCC-DTF |
| Plaintiff, | ) | |
| vs. | ) | **REPORT AND RECOMMENDATION** |
| Roberto Enrique Balcazar, et al., | ) | |
| Defendants. | ) | |

    Pending before the Court is a Joint Motion to Suppress Evidence filed by Defendants Roberto Enrique Balcazar and Gabriel Velez-Willem (Doc. Nos. 36, 38, 64, 65.) The government responded in opposition to the motion. (Doc. Nos. 46, 70.) This matter came before the Court for a hearing and a report and recommendation as a result of a referral, pursuant to LRCrim 5.1. Defendants' Motion was set for evidentiary hearing and evidence was heard on February 22, 23 and 24, 2010. Defendants were present and represented by counsel. This matter was submitted following oral argument at the conclusion of the hearing and taken under advisement.

    Defendants' Motion seeks to suppress evidence seized from a Ford Focus automobile by Government agents. Having now considered the matter, the Magistrate Judge recommends that the District Court, after its independent review, DENY Defendants' Motion to Suppress Evidence.

**FACTUAL FINDINGS**

On May 13, 2009, Immigration and Customs Enforcement (ICE) Special Agent (SA) Mario Porras received information from a confidential informant that a white Ford Focus automobile bearing a specific Arizona license number may contain a controlled substance and was going to enter the United States from Mexico at the DeConcini Port of Entry. The Arizona vehicle registration showed Gabriel Velez-Willem was the registered owner and provided an address in Nogales, Arizona. ICE agents used this informant tip to set up a surveillance at the port of entry and at Velez-Willem's residence.

Later that day, at about 1:51 p.m., Velez-Willem passed through the DeConcini Port of Entry driving his white Ford Focus automobile. SA Roberto Hein followed the Ford Focus from the port of entry to the Old City Hall in Nogales. Velez-Willem went into the building and attended a Cochise Community College class being held at this location. ICE agents maintained constant surveillance of the Ford Focus while Velez-Willem attended his class.

After class, Velez-Willem drove the Ford Focus to his residence and went inside. When Velez-Willem parked his vehicle, surveillance agents' view was blocked by vegetation for one to two minutes until they could move to a better vantage point. Except for this brief period, the Ford Focus was under constant surveillance. Velez-Willem left his residence about 20 minutes later and drove the Ford Focus to a gas station and purchased fuel. When he left the gas station he drove into another parking lot, made a U-turn and drove back onto the same street. According to SA Hein, this maneuver was consistent with counter surveillance techniques he has seen used by drug smugglers.

Velez-Willem then drove to Interstate 19 and continued north to Tucson, passing through the Border Patrol checkpoint near Amado, Arizona. Velez-Willem pulled into the Lowe's Home Improvement store located at the intersection of North Oracle Road and West Limberlost Drive, where he met Roberto Enrique Balcazar. Balcazar arrived driving a Dodge Caliber SUV with Mexican registration. Velez-Willem and Balcazar spoke with each other

and then exchanged keys. At approximately 4:40 p.m., Velez-Willem drove away in the Dodge Caliber[1] and Balcazar left in the Ford Focus.

ICE continued their surveillance on the Ford Focus as Balcazar turned eastbound on West Limberlost Drive, turned north on North Fairview Avenue, turned west on West Wetmore Road, and turned north on North La Cholla Boulevard to West River Road. Balcazar pulled into a shopping center on the northeast corner of this intersection. He drove the Ford Focus through the parking lot and exited traveling westbound on River Road. Balcazar then made an immediate U-turn traveling east on River Road. Balcazar remained in the northernmost lane of the eastbound traffic and pulled into the left turn lane at the intersection of River Road and North Oracle Road. Balcazar then pulled from the left turn lane, across all lanes of traffic, and turned south on Oracle Road. Heading south on Oracle, Balcazar failed to yield to a red traffic signal at the West Automall Drive. He then pulled into the Tucson Mall parking lot at approximately 5:00 p.m.[2]

ICE agents had maintained constant surveillance of the Ford Focus as it took this circuitous route, only momentarily losing sight when it turned a corner, or passed through a curve or a dip in the roadway. ICE agents believed Balcazar had been conducting counter surveillance and determined it was time to stop the vehicle when he failed to yield at the traffic signal.

After the stop Balcazar was removed from the Ford Focus, handcuffed and placed in the back of a government vehicle. Because the Ford Focus was blocking the roadway it was

---

[1] Velez-Willem was followed to a coin store located in a shopping center at the corner of North Oracle Road and East Orange Grove Road.

[2] When he pulled into the mall parking lot, Balcazar was about a block and a half from his starting point at the Lowe's Home Improvement Store. It took Balcazar more than 10 minutes to reach the mall.

moved a short distance to the Firestone Tire parking lot.[3]

Officer Ken Atchley, Tucson Police Department, responded to the scene with his narcotics-detecting dog Janko. Janko first entered the Ford Focus's passenger compartment and did not alert. Next, Janko was walked around the car's exterior and failed to alert. Shortly thereafter, ICE SA Alexander Garcia inspected the Ford Focus. SA Garcia had developed an expertise in identifying non-factory built compartments on vehicles.[4] Using a mirror attached to a long handle SA Garcia was able to peer into spaces without having to physically bend or crawl into the location. He first peered under the dashboard, standing from outside the Ford Focus and placing the mirror under the dashboard. Finding nothing unusual, he moved to the undercarriage. During this inspection, SA Garcia found a non-factory-built compartment in the center of the undercarriage.

The Ford Focus was then moved to a lift at the Firestone Tire Store and raised. Gaining access to the undercarriage, ICE agents could more clearly see the compartment. The compartment had a hole to allow a factory cable to pass through, which was partially covered by a heat shield. ICE agents could see some kind of package through the hole. The heat shield was moved, which allowed a better view of the package. Next, agents lowered the vehicle closer to the ground so that Janko could walk under it. This time Janko alerted to the presence of a controlled substance.[5]

Velez-Willem and Balcazar were taken into custody and transported from the scene.

---

[3] At about the same time, ICE agents entered the coin shop and detained Velez-Willem. Both Velez-Willem and the Dodge Caliber were then transported to the Tucson Mall.

[4] According to SA Garcia, he has performed "thousands" of inspections on vehicles with false compartments. For the last four years he has been an instructor training other state, federal and local law enforcement officers on identifying non-factory-built compartments in vehicles.

[5] According to Officer Atchley, he wanted to allow Janko a second inspection for training purposes.

- 4 -

Neither made statements. The Ford Focus was transported to the port of entry in Nogales, Arizona, on May 13, 2009, where the secret compartment in the undercarriage was opened and about seven kilograms of cocaine was seized. In addition, cellular telephones, a laptop computer, two thumb drives and miscellaneous documents were seized from the Ford Focus.[6] About two weeks later, on May 27, while still in ICE impound, the Ford Focus was re-inspected and an additional 11 kilograms of cocaine was seized from another compartment.

On June 10, 2009, Balcazar and Velez-Willem were charged in a two-count indictment with conspiracy to possess with intent to distribute approximately 18.52 kilograms of cocaine (Count 1) and possession with intent to distribute approximately 18.52 kilograms of cocaine (Count 2), in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(ii)(II), and 846.

**ANALYSIS**

Defendants assert the warrantless search of the Ford Focus violated their Constitutional rights. They seek an order to suppress the fruits of this search. The Government argues the contested search is justified by two legal theories: an extended border search and probable cause. Initially, the Government asserts Velez-Willem lacks standing to challenge the search of the Ford Focus automobile. The Government concedes standing as to Balcazar.

**1. <u>Standing</u>**

A defendant cannot challenge the legality of a search unless his or her Fourth Amendment rights were violated. *United States v. Padilla*, 508 U.S. 77, 80-81 (1993). The appropriate test to be applied in determining whether Velez-Willem's rights were violated by the search of the Ford Focus and the seizure of the cocaine within it is whether, by that

---

[6] The Government obtained a search warrant to search the contents of these electronic devices. Neither Velez-Willem nor Balcazar specifically moved to suppress this evidence. A Magistrate Judge's decision to issue a search warrant should be awarded great deference. *Ornelas v. United States*, 517 U.S. 690, 698-99 (1996).

- 5 -

act, Velez-Willem suffered an invasion of a legitimate expectation of privacy. *Rakas v. Illinois*, 439 U.S. 128, 148-49 (1978). The defendant must demonstrate that he had an actual subjective expectation of privacy and that expectation must be one that society is prepared to recognize. *Katz v. United States*, 389 U.S. 347, 361 (1967).

Velez-Willem argues that he has standing because the evidence clearly established he was the registered owner of the vehicle. The general rule is that the owner of a vehicle has standing to challenge the legality of a search. *United States v. Wanless,* 882 F.2d 1459, 1462 (9th Cir. 1989). However, ownership is not determinative and is only one factor amongst a myriad of considerations to be weighed when assessing the reasonableness of a defendant's expectation of privacy in a vehicle. *United States v. One 1977 Mercedes Benz*, 708 F.2d 444, 449 (9th Cir. 1983).

One has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects. A car has little capacity for escaping public scrutiny. It travels public thoroughfares where both its occupants and its contents are in plain view. *Cardwell v. Lewis,* 417 U.S. 583, 590 (1974).

In *One 1977 Mercedes Benz*, the Ninth Circuit Court of Appeals held that a defendant lacked standing to challenge the search of her vehicle where she had voluntarily turned possession of that automobile over to a third party for his exclusive use and had taken no precautions to safeguard any privacy interest within the vehicle. 708 F.2d at 449. The relevant holding from *One 1977 Mercedes Benz* has been applied broadly in this district. In *United States v. Vizcarra*, 835 F. Supp. 1160, 1162 (D. Ariz. 1993), the Court held, "where the owner of a vehicle has turned that vehicle over to someone else, the owner retains an insufficient privacy interest to possess standing to challenge the search of that vehicle."

As in *One 1977 Mercedes Benz* and *Vizcarra*, Velez-Willem turned his vehicle over to another person. Velez-Willem has offered no evidence regarding his expectation of privacy in the vehicle after he turned it over to Balcazar. Accordingly, Velez-Willem has not

met his burden of demonstrating a reasonable expectation of privacy in the Ford Focus at the time the searches were conducted.

Although the Court finds that Velez-Willem does not have standing, for purposes of providing a thorough report and recommendation, it conducts the remainder of the analysis as to both defendants.

### 2. **Border Search**

The border-search exception is grounded in the recognized right of the sovereign to control, subject to substantive limitations imposed by the Constitution, who and what may enter the country. *United States v. Ramsey*, 431 U.S. 606, 620 (1977).[7] Under certain circumstances, searches that take place away from the border or remote in time from the initial inspection can still be considered border searches. This involves two related doctrines: the functional equivalent of the border and the extended border search doctrine. *United States v. Alfonso*, 759 F.2d 728, 734 (9th Cir. 1985). The main difference between the functional equivalent of the border search and an extended border search is that the latter takes place after the first point in time when the entity might have been stopped within the country. *United States v. Guzman-Padilla*, 573 F.3d 865, 878 (9th Cir. 2009).

When a search is removed in time and place from the border, the courts repeatedly have held that this represents a greater intrusion on the person and, under the totality of the circumstances, customs officers must have reasonable suspicion of criminal activity in order to justify the search, the so-called "extended border search." *United States v. Whiting*, 781 F.2d 692, 695 (9th Cir. 1986); *United States v. Cardona*, 769 F.2d 625, 628 (9th Cir. 1985);

---

[7] The border search exception is codified at 19 U.S.C. § 1581(a):
Any officer of the customs may at any time go on board of any vessel or vehicle at any place in the United States ... or at any other authorized place, without as well as within his district, and examine the manifest and other documents and papers, and examine, inspect, and search the vessel or vehicle and every part thereof and any person, trunk, package, or cargo on board, and to this end may hail and stop such vessel or vehicle, and use all necessary force to compel compliance.

- 7 -

*United States v. Alfonso*, 759 F.2d at 734; *United States v. Bilir*, 592 F.2d 735, 740-741 (9th Cir. 1979). As the court in *Alfonso* stated:

> We recognize, of course, that time and place are relevant, since the level of suspicion for extended border searches is stricter than the standard for ordinary border searches. Extended border searches occur after the actual entry has been effected and intrude more on an individual's normal expectation of privacy. Therefore, extended border searches must be justified by "reasonable suspicion" that the subject of the search was involved in criminal activity, rather than simply mere suspicion or no suspicion.

759 F.2d at 734.

In addition, an extended border search requires that law enforcement officers possess a "reasonable certainty" that a border has been crossed, either by the vehicle in question, or by contraband suspected to be within the vehicle. *See United States v. Sahanaja*, 430 F.3d 1049, 1053-54 (9th Cir. 2005). Reasonable certainty "is a higher standard than that of probable cause, [but] it does not require knowledge beyond a reasonable doubt." *United States v. Corral-Villavicencio*, 753 F.2d 785, 788 (9th Cir. 1985); *United States v. Guzman-Padilla*, 573 F.3d 865, 880 (9th Cir. 2009).

Here, ICE agents were alerted by a reliable confidential informant to the likelihood that a Ford Focus carrying drugs would pass through the border. The reliability of this tip was bolstered when the ICE agents personally observed the Ford Focus pass through the port of entry from Mexico. Consequently, when ICE agents began their surveillance they were armed with both "reasonable certainty" that the border was crossed and "reasonable suspicion" that criminal activity was afoot. *United States v. Palos-Marquez*, 591 F.3d 1272, 1275 (9th Cir. 2010) (an in-person tip by an unidentified informant can have a significant indicia of reliability for purposes of reasonable suspicion); *United States v. Martinez*, 481 F.2d 214, 218 (5th Cir. 1973)(informant's tip concerning truck bearing marijuana was confirmed by the truck actually crossing the border and warrantless search of the truck approximately 150 miles from the border and 142 hours later was based on reasonable suspicion and was valid as a border search).

Instead of stopping the Ford Focus at the port of entry, or at another location near the

border, ICE agents decided to follow the vehicle to permit the suspected criminal scheme to continue in order to possibly locate a stash house and identify others involved. *See United States v. Espericueta-Reyes*, 631 F.2d 616, 620 (9th Cir. 1980) (the work of customs officials is made far more effective by the identification of accomplices of the carrier bringing contraband into the United States). ICE agents followed the Ford Focus as it made its way from Nogales, Arizona to Tucson, Arizona, where the original driver was replaced by an individual who arrived driving a vehicle with Mexican registration. This event created additional suspicion due to the ICE agents' experience that Mexican drug traffickers often use different people to cross contraband over the border than they use to deliver the loaded vehicle to the stash house.

The Ford Focus left the Lowe's parking lot under the watchful eye of ICE agents. The vehicle traveled a circuitous route and was being driven in a reckless manner causing ICE agents to believe their surveillance had been compromised. They decided to stop the Ford Focus after it turned into the Tucson mall parking lot. Subsequent searches of the vehicle disclosed a large amount of cocaine hidden in secret compartments.

When a search for contraband by ICE agents is conducted a considerable distance away from the border, as in this case, "the legality of the search must be tested by a determination whether the totality of the surrounding circumstances, including the time and distance elapsed as well as the manner and extent of surveillance, are such as to convince the fact finder with reasonable certainty that any contraband which might be found in or on the vehicle at the time of search was aboard the vehicle at the time of entry into the jurisdiction of the United States." *United States v. Alexander*, 362 F.2d 379, 382 (9th Cir. 1966). As explained by the Ninth Circuit:

> The distance from the border, whether it be 105 miles or 500 miles, is important only as it relates to the surveillance and any other circumstance which aids the fact finder in determining with reasonable certainty that any contraband which might be found in the vehicle at the time of the search "was aboard the vehicle at the time of entry into the jurisdiction of the United States."

*Castillo-Garcia v. United States*, 424 F.2d 482, 485 (9th Cir. 1970) (upholding border search conducted seven hours and 105 miles from the border); *Rodriguez-Gonzalez v. United States*, 378 F.2d 256, 258 (9th Cir. 1967) (finding reasonable certainly for border search conducted 15 hours and 20 miles from border based on constant surveillance).

Here, ICE agents had maintained constant surveillance on the Ford Focus from the time it entered the United States at the DeConcini Port of Entry until it was finally stopped in the Tucson Mall parking lot. The Ford Focus was never out of ICE agents' view for more than two or three minutes at any one time. No one tampered with the vehicle and the only drivers were Velez-Willem and Balcazar. As a result, the ICE agents possessed a "reasonable certainty" that the Ford Focus would still contain any contraband which might have been aboard the vehicle at the time it entered the United States through the DeConcini Port of Entry. Based on the totality of circumstances, ICE agents also had reasonable suspicion that criminal activity was afoot. Hence, the ICE agents were justified in conducting an extended border search on May 13, and the seizure of evidence was lawful.

On May 27, 2009, a second search was conducted by ICE personnel and another 11 kilograms of cocaine were seized. Defendants argue that this search was too attenuated from the events of May 13, 2009, and the cocaine seized in that search should be suppressed.

The Ford Focus had been transported to the port of entry in Nogales, Arizona, on May 13, 2009, and impounded by ICE in connection with the arrests of Defendants. In *United States v Noster*, 590 F.3d 624, 634 (9th Cir. 2009), the police had seized the defendant's car in connection with a report that it had been stolen and the defendant did not argue that the continued retention of it was in any way improper. After it was seized, an inventory search was conducted. About eight days later, a second search was conducted predicated on probable cause developed after the vehicle had been seized. The court found the delay in completing the search "did not diminish the probable cause or render the search otherwise unreasonable." *Id.*

Similarly, Velez-Willem's Ford Focus was seized in connection with Defendants'

arrest and the discovery of cocaine hidden in a secret compartment. The vehicle was put in ICE impound where it was located at the time of the May 27, 2009 search. Neither Velez-Willem nor Balcazar have asserted this continued retention was improper. Because the vehicle was held by ICE, the delay in completing the search did not diminish the reasonable certainty that any contraband found was in the vehicle at the time of its entry nor render it otherwise unreasonable. *Id.*; *Castillo-Garcia v. United States*, 424 F.2d at 485; *United States v. Espericueta-Reyes*, 631 F.2d 616, 619 (9th Cir. 1980) (each search made after the initial border crossing was part of an extended border search which was reasonable and consonant with the Fourth Amendment); *United States v. Flores*, 594 F.2d 438, 439 (5th Cir. 1979) (upholding more extensive search nine days after car seized at border because it contained heroin).

### 3. **Probable Cause**

The Government argues the agents had probable cause to believe there was contraband in the Ford Focus as an additional ground to justify the search. This Court agrees. Law enforcement officers need not obtain a warrant to search an automobile when they have probable cause to believe it contains contraband. *United States v. Ross*, 456 U.S. 798, 804-09 (1982); *United States v. Ibarra*, 345 F.3d 711, 715-16 (9th Cir. 2003). Probable cause requires finding that, under the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

ICE agents had received a reliable tip that the Ford Focus bearing a specific Arizona license plate might be loaded with narcotics. The Ford Focus crossed the border as described by the informant. The vehicle bore the license plate number provided by the informant and the vehicle was followed to the registered owner's address. All of this information further corroborated the informant tip.

ICE agents then followed Velez-Willem from Nogales to Tucson. During this trip, Velez-Willem drove into a parking lot, made a U-turn and pulled back out onto the same road

in the same direction he had been traveling. This reasonably raised more suspicion that the vehicle might be loaded with contraband, because this was consistent with techniques used by smugglers to determine whether they are being followed.

Velez-Willem continued on to a Lowe's Home Improvement store in Tucson. He did not enter the store, rather he met with Balcazar. Balcazar had arrived driving a Dodge Caliber SUV bearing Mexican registration. Agents saw Velez-Willem and Balcazar exchange car keys.

At the evidentiary hearing, SA Hein explained that he believed there was a high probability the Ford Focus contained a controlled substance when Velez-Willem gave Balcazar the keys to the Ford Focus in the Lowe's parking lot. According to SA Hein, Mexican drug traffickers attempt to insulate themselves from law enforcement by employing couriers to bring the drugs across the border without disclosing the ultimate destination for the drugs. In this way, if the drugs are detected at the border the courier will be unable to assist law enforcement in finding the stash house.

ICE agents followed Balcazar as he left the Lowe's parking lot. Balcazar took a circuitous route and drove in an erratic and dangerous manner. Given the totality of circumstances, ICE agents had reasonable suspicion to stop the Ford Focus. Thereafter, SA Garcia found a non-factory-built compartment in the center of the undercarriage. With this discovery, reasonable suspicion ripened into probable cause to believe the compartment contained drugs.

Defendants argue that placing Janko inside the Ford Focus was an unlawful search. But for the extended border search discussed above, allowing Janko to search the interior of the car before probable cause was developed would have been unlawful. On the other hand, no evidence was obtained in this search. Similarly, the use of a mirror to look under the dash board was a search, but no evidence was obtained. In contrast, the use of the mirror to examine the undercarriage was not a search. Defendants do not claim, nor could they, that agents could not lawfully look at the exterior of the Ford Focus. The mirror merely enabled

the agent to see under the car without actually crawling underneath. Hence, the use of the mirror was not a search. *United States v. Rascon-Ortiz*, 994 F.2d 749, 754 (10th Cir. 1993) (use of a mirror to reflect and direct the flashlight's beam did not, by itself, constitute a search as the mirror was simply used as an artificial means of optical enhancement); *United States v. Dunn*, 480 U.S. 294, 305 (1987) ("A truly cursory inspection–one that involves merely looking at what is already exposed to view, without disturbing it–is not a 'search' for Fourth Amendment purposes.").

Defendants also argue that raising the Ford Focus on the lift to gain a better view of the secret compartment and moving the heat shield to see more clearly into the compartment were unlawful searches. The Court agrees these actions constituted a search. *See Arizona v. Hicks*, 480 U.S. 321, 322 (1987) (turning stereo equipment to view serial number a search). However, prior to these actions, the ICE agents had developed probable cause based on the discovery of the non-factory-built compartment. Thus, the agents acted lawfully when they placed the car on the lift to more closely examine the compartment.

Finally, Defendants claim their arrests were not supported by probable cause. Velez-Willem argues the cocaine was not discovered until after he was taken into custody. Balcazar argues the agents only had observed violations of Arizona Traffic Codes, for which they lacked arrest authority. They reason, under *Wong Sun v. United States*, 371 U.S. 471 (1963), the cocaine should be suppressed as the tainted fruit of their unlawful arrest.

It is unnecessary to determine whether Velez-Willem was detained or under arrest, because neither action bore any casual relationship to the discovery of the cocaine. The cocaine was discovered in the Ford Focus driven by Balcazar. Hence, the cocaine can not logically be considered the "fruit" of Velez-Willem's arrest. *United States v. Sharpe*, 470 U.S. 675, 683 (1985).

Balcazar has misconstrued the evidence against him. As described above, ICE agents had both reasonable certainty that the Ford Focus had crossed the border and reasonable suspicion Balcazar was involved in drug smuggling when they stopped him in the Tucson

Mall parking lot. From the time Balcazar was stopped until the secret compartment was discovered was very brief. SA Garcia testified that he was with the team that detained Velez-Willem and that he drove to the mall immediately thereafter and began his inspection within two to three minutes of his arrival.

"[I]n assessing the effect of the length of the detention, we take into account whether the police diligently pursue their investigation." *United States v. Place*, 462 U.S. 696, 709 (1983). In short, Balcazar's detention was brief and lasted no longer than was necessary to effectuate the purpose of the stop. *Florida v. Royer,* 460 U.S. 491, 500 (1983).

## RECOMMENDATION

In view of the foregoing, it is recommended that, after its independent review of the record, the District Court DENY Defendants' Joint Motion to Suppress. (Doc. Nos. 36, 38.) The Magistrate Judge further recommends the District Court grant Defendant Velez-Willem's Motion to Join Defendant Balcazar's Reply Brief. (Doc. No. 65.)

Pursuant to Federal Rule of Criminal Procedure 59(b)(2), any party may serve and file written objections within 14 days of being served with a copy of this Report and Recommendation. If objections are not timely filed, they may be deemed waived. The parties are advised that any objections filed are to be identified with the following case number: **CR-09-1119-TUC-RCC**.

DATED this 8th day of March, 2010.

D. Thomas Ferraro
United States Magistrate Judge